**Donald T. GREER and, Elizabeth P. Greer, Plaintiffs,**

v.

**OWNERS INSURANCE COMPANY and Fidelity National Property and Casualty Insurance Company, Defendants.**

**No. 3:05 CV 232 RV/MD.**

United States District Court,
N.D. Florida,
Pensacola Division.

June 6, 2006.

WHF Wiltshire, Harrell Wiltshire, P.A., Pensacola, FL, for Plaintiffs.

John Auld Unzicker, Jr., Michelle Lynn Hendrix, Vernis & Bowling of Northwest Florida, P.A., Pensacola, FL, Gerald J. Nielsen, William T. Treas, Nielsen Law Firm, Metairie, LA, for Defendants.

## ORDER

VINSON, Senior District Judge.

In this insurance dispute, Plaintiffs Donald T. Greer and Elizabeth P. Greer seek to recover the full face amount of their property insurance policies issued by Defendant Owners Insurance Company and Defendant Fidelity National Property and Casualty Insurance Company. Pending is the motion for judgment on the pleadings submitted by Defendant Fidelity National Property and Casualty Insurance Company. (Doc. 37). Also pending are the motions for summary judgment submitted by the plaintiffs and the defendants. (Docs. 45, 63, and 69). A hearing concerning the parties' respective summary judgment motions was held on March 9, 2006. One day after this hearing, on March 10, 2006, the plaintiffs submitted a notice of filing with this Court, attaching evidence in opposition to the motion for summary judgment filed by Defendant Fidelity National Property and Casualty Insurance Company. (Doc. 137). Defendant Fidelity National Property and Casualty Insurance Company has filed a motion to strike this evidence. (Doc. 141). Unless otherwise noted, the following facts appear to be undisputed in the record.

## I. FACTUAL BACKGROUND

Plaintiffs Donald T. Greer and Elizabeth P. Greer own a home located approximately 900 feet from Star Lake, a tidal inlet connected to Escambia Bay, in Pensacola, Florida. The plaintiffs maintained two in-

surance policies covering their residential property. Defendant Owners Insurance Company ("Owners") provided the plaintiffs a homeowner's insurance policy covering fire and wind damage, among other perils, and Defendant Fidelity National Property and Casualty Company ("Fidelity") provided a policy covering the plaintiffs for damage caused by flood.

Owners' windstorm insurance policy provides the following coverage limits: (a) $202,000 for the plaintiffs' residential dwelling, (b) $20,200 for "other structures," defined as structures which are not attached to the dwelling; (c) $141,400 for personal property; and (d) $40,400 for additional living expenses, including any reasonable increase in living expenses necessary to maintain the plaintiffs' normal standard of living while they live elsewhere, in the event that a covered loss makes their home uninhabitable.

Owners' policy covered direct loss to the plaintiffs' property unless the loss came within one of the exclusions set forth in the policy. One such exclusion provides:

> "We do not cover loss to covered property caused directly or indirectly by any of the following, whether or not any other cause or event contributes concurrently or in any sequence to the loss:

> \* \* \* \* \* \*

> "Water damage, meaning:

> (a) flood, surface water, waves, tidal water or overflow of a body of water.

> We do not cover spray from any of these, whether or not driven by the wind."

The terms of Owners' policy with respect to "personal property" includes coverage for the following peril:

> "Windstorm or Hail. This peril does not include loss:

> (a) to covered property in any building, caused by rain, snow, sand, sleet or dust unless the building is first damaged by the direct force of wind or hail, creating an opening through which the rain, snow, sleet or dust enters the building;"

Fidelity issued the plaintiffs a standard flood insurance policy ("SFIP"), which coverage is provided by the federal government under the National Flood Insurance Program. In accordance with the terms of the SFIP, the plaintiffs' home was insured for $221,400, with a $500 deductible, and the contents of the plaintiffs' home was insured for $100,000, with a $500 deductible.

As a result of Hurricane Ivan, which hit the Pensacola area on or about September 15, 2004, the plaintiffs' home suffered damage. Mr. Greer went to inspect his home two days after the storm, and he testified that the walls of the home still appeared to be intact, the doors and the windows were not broken, and the roof was still attached. However, the interior of his home was in shambles due to substantial flooding, and it appeared that some wind-driven rain had entered the house through ridge vents and exhaust fan openings. Further, the opening to the attic was ajar. On the outside of the plaintiffs' home there was significant debris strewn about, and a tree had fallen on the plaintiffs' roof.

Greer immediately called his insurance agent, who in turn contacted representatives from Fidelity and Owners. Fidelity notified Colonial Claims Corporation, an independent adjusting company, to assist the plaintiffs in making a claim under their flood insurance policy. Colonial's adjuster, David Edwards, examined the property

approximately two weeks after the hurricane. During the storm, flood water invaded the interior of the house, with the high water line reaching at least 21 inches up the interior walls. Following Edwards' inspection, Greer e-mailed Edwards a spread sheet, listing the personal property that was damaged. However, Greer states that he had difficulty getting Edwards to correspond with him or return his phone calls.[1]

A FEMA adjuster estimated the cost of repairs due to flooding to be $27,238.00, while an adjuster from the Small Business Administration ("SBA") placed the flooding damage cost at $127,511.70.[2] Fidelity's adjuster eventually estimated that the cost to repair damage due to flooding would be near the middle of these two ranges—$71,956.90. Accordingly, Fidelity issued payments to the plaintiffs in the amount of $66,522.00 and $4,934.20, the recoverable depreciation, for a total payment of $71,456.90 (after the $500 deductible). Fidelity did not make any payment to the plaintiffs for the personal property damages. During the hearing in this case, Fidelity explained that it did not issue a payment for the plaintiffs' personal property because it never received a claim or itemized list from the plaintiffs. In fact, a memo from Fidelity's adjuster, dated January 27, 2005, indicates, "contents inventory has not been submitted." However, it appears from the top of a copy of Greer's e-mail (late-filed and challenged by Fidelity) that the list was in fact sent to Fidelity's adjuster.

Owners also sent an adjuster to the plaintiffs' property to inspect the damage. Owners' adjuster, James Magouirk, determined that the extent of damage caused by wind, as opposed to flooding, was confined to the roof, the ceiling, and some attic insulation. Owners' expert, Daniel T. Sheehan, a professional engineer, agreed with Magouirk's assessment. According to Sheehan, who also inspected the plaintiffs' home, the interior of the home was not subject to damage caused by high winds because the doors and windows had remained intact. The wind blew off some of the roofing shingles, but the physical evidence and the pictures of the roof reveal that, even though the roof lost some shingles during the hurricane, there were no sections where the wood roof deck was exposed. Thus, the roof was still providing a substantially watertight surface throughout the hurricane. Nevertheless, some water did get into the attic, resulting in relatively minor water damage to the attic insulation and to the sheetrock ceilings in various rooms of the home.[3] Sheehan determined that it would be necessary to replace the roof. Thus, according to Sheehan and Owners' adjuster, the repairs due to damage caused by wind included replacing the roof shingles, performing some minor ceiling repairs, removing and replacing some of the attic insulation, and some inside painting. However, Sheehan agreed with Magouirk that the scope of the damage caused by the wind was limited to the roof, attic, and ceilings.

Sheehan explained that the damage caused by flood and the damage caused by

---

**1.** The e-mail and attached spread sheet are two of the documents being challenged in Fidelity's pending motion to strike, *see* Doc. 141, which will be discussed in section II.A, *infra.*

**2.** Before the plaintiffs received payment from either of the defendants, the plaintiffs applied for a loan with the Small Business Adminis-

tration in order to begin repairing their house.

**3.** The roof on the front slope of the house lost some shingles, but the roof on the back slope of the house remained wholly intact.

wind are easily distinguishable in the plaintiffs' house because of the presence of a high water mark inside the house, and due to the fact that during the hurricane none of the walls, roof, windows, or exterior doors were breached by the wind. Magouirk's cost estimate, which Sheehan agreed was accurate, estimated the total cost of repairs to the dwelling due to wind damage to be $15,149.92. Further, Magouirk also estimated that Owners was liable for $980 under the "Other Structures" coverage, and $250.00 under the "Personal Property" coverage of the insurance policy. Thus, Magouirk determined that Owners total liability was $16,379.92. Owners subsequently paid to the plaintiffs $16,879.92, which represents the $16,379.92, plus a $1,000 payment for the policy limit for sewage back-up, minus the $500 deductible.[4]

Shortly after the storm, the plaintiffs hired Ed Rankin, a licensed residential contractor, to inspect their home and determine the total cost of repairs. According to Greer, Rankin was not supposed to differentiate between damage caused by wind and that caused by flood. Rankin ultimately estimated that the total cost of repairs to the plaintiffs' home, caused by the combined damage due to flooding and wind-storm, would be $182,570.61. On Rankin's detailed cost repair estimate, there is a section titled "Wind Storm Repairs," which lists the cost of repairing items related to the roof, ceiling, and attic insulation. The total cost of those repairs, according to Rankin's report, are approximately $31,000, plus markup and tax.

However, Rankin explained that he only prepared the repair cost estimate in that format because he had reviewed the cost repair estimates of the insurance companies, and he was attempting to write his repair estimate in the same format. Rankin reiterated, however, that he made no attempt to actually make a determination of what was damaged by wind versus flooding.

At some point after the hurricane, Mr. Greer requested the Escambia County Building Inspections Department to determine whether his house was substantially damaged. Danny R. Weeden, employed with the Escambia County Building Inspections Department, eventually notified the plaintiffs that the extent of damage to their house rendered it "substantially damaged." The letter from Weeden explained that "substantial damage" was defined as follows:

"Florida Building Code 2001, Section 3401.7, Escambia County Code of Ordinances, Part III, Article 10, and 44 Code of Federal Regulations, Section 591.1, determines that a structure is substantially damaged when damage of any origin is sustained by a structure whereby the cost of restoring the structure to its before damaged condition would equal or exceed 50 percent of the market value of the structure before the damage occurred."

The letter further warned that when a structure is determined to be substantially damaged, it must be brought into compliance with the current Florida Building

---

4. An inspector representing FEMA estimated the repairs due to wind damage to be $2,726.00. In fact, this inspector indicated that the damage to the structure was due to "inundation damage only." The adjuster with the SBA estimated the repair costs to the roof and ceiling to be approximately $16,095.20, but the SBA adjuster did not make any determination as to whether windstorm or flooding caused the particular damage that needed to be repaired.

Codes, Escambia County Ordinances, and/or Flood Plain Construction Regulations. Weeden testified that he had not actually inspected the plaintiffs' property himself. Rather, the "substantially damaged" determination was based wholly on Ed Rankin's repair cost estimate submitted by the plaintiffs. When a market value is not available, the Building Inspection Department determines the property's adjusted tax assessed value, and then divides that number into the estimated cost of repairs to determine the overall percent of damage to the home. In the Greers' case, the adjusted tax assessed value was approximately $95,544.00. Therefore, based on Rankin's cost estimate of $182,570.61, the Department determined that the plaintiffs' home was 191% damaged. In making this determination, Weeden explained that he also reviewed the Damage Inspection Report, prepared by a FEMA adjuster who inspected the plaintiffs' home and estimated the cost of repairs to be $29,964.00, but that he based his substantially damaged determination letter on the report prepared by Rankin, at the request of Mr. Greer.

Mr. Greer also obtained a certificate from an engineering firm, certifying that the present elevation of the plaintiffs' home is 8.2 feet. At the time of the hurricane, and when this litigation began, the flood zone where the plaintiffs' home is located required only a base flood elevation (minimum construction level) of 7 feet. Thus, the actual elevation of the plaintiffs' home was 1.2 feet above the required elevation. After the close of discovery and subsequent to each of the parties filing their respective summary judgment motions, the plaintiffs filed a notice with the court that there had been an amendment to Sections 10.03.03 and 10.03.04 of the Escambia County Flood Code. The amendments increased the minimum flood elevation requirement of the plaintiffs' property by 3 feet. According to the plaintiffs, the base flood elevation required for the plaintiffs' home would now be 10 feet.

In plaintiffs' complaint, they contend that Florida's Valued Policy Law, Section 627.702(1) of the Florida Statutes, requires Owners and Fidelity to pay the full face amount of each respective policy. Therefore, the plaintiffs are seeking from Owners $387,620.08. This figure represents the policy limits for their dwelling, minus the $15,879.92 already paid to the plaintiffs, plus $20,200.00 under their "Other Structures" coverage, $141,400.00 under their personal property coverage, and $40,400.00 for Additional Living Expenses Coverage.

Since the arguments asserted by Fidelity in its motion for judgment on the pleadings and summary judgment motion are not necessarily applicable to Owners' policy, I will address the motions of Owners and Fidelity separately. Before addressing these dispositive motions, however, I will first consider Fidelity's motion to strike.

## II. DISCUSSION

### A. FIDELITY'S MOTION TO STRIKE

As already noted, the plaintiffs filed evidence with this Court shortly after the March 2006 summary judgment hearing. Specifically, the plaintiffs filed affidavits, a copy of the e-mail and spread sheet referenced above, and correspondence to Fidelity from their attorney demonstrating that Fidelity had notice of the personal property claims. Fidelity has filed a motion to strike these documents, arguing the evidence constitutes an attempt by the

plaintiffs to file a belated opposition to Fidelity's summary judgment motion (in violation of local rules); the e-mail evidence was not disclosed to Fidelity during the plaintiffs' Rule 26 disclosures or at any time during discovery; and the evidence is irrelevant to the plaintiffs' breach of contract claim. Fidelity's arguments are all well-taken, particularly given that the plaintiffs have not filed any response to, and therefore do not appear to oppose, the motion to strike. Nevertheless, the motion must be denied as moot because the evidence being challenged, even if considered and made part of the record, does not alter my determination that summary judgment must be granted for Fidelity. *See, e.g., Shaw v. Hospital Authority of Cobb County*, 614 F.2d 946 (5th Cir.) (per curiam), *cert. denied*, 449 U.S. 955, 101 S.Ct. 362, 66 L.Ed.2d 220 (1980) (denying as moot defendant's motion to strike an affidavit filed by plaintiff where summary judgment was granted for defendant in same Order).

### B. *FIDELITY'S MOTION FOR JUDGMENT ON THE PLEADINGS*

Fidelity moves for judgment on the pleadings, arguing that plaintiffs' state law claims are not applicable to its flood insurance policy. Specifically, Fidelity contends that plaintiffs' Valued Policy Law claim based on Section 627.702(1) of the Florida Statutes is preempted by federal law.[5] As noted, the flood policy at issue in this case is a SFIP issued to the plaintiffs through the National Flood Insurance Program ("NFIP"). The NFIP was established by Congress, through the National Flood Insurance Act ("NFIA") [42 U.S.C. §§ 4001 *et. seq.*], in order to make "flood insurance coverage available on reasonable terms and conditions to persons who have need for such protection." 42 U.S.C. § 4001(a). The Director of FEMA manages the program, controlling the payment or disallowance of all flood insurance claims. Claims are paid out of a National Flood Insurance Fund in the United States Treasury. 42 U.S.C. § 4017(a).

By statute and regulation, private insurers such as Fidelity may offer a SFIP under a "Write–Your–Own" ("WYO") program. *See* 42 U.S.C. § 4051; 44 C.F.R. § 61.13(f). However, all of the terms and conditions of a SFIP are mandated and controlled by the NFIA and federal regulations [codified at 44 C.F.R. Pt. 61, App. A.] In accordance with federal regulatory law, a private insurer issuing a SFIP may not alter, amend, or waive any provision of the SFIP, absent express written consent from the Federal Insurance Administrator. *See* 44 C.F.R. Pt. 61, App A(1), Art.9(D); 44 C.F.R. Pt. § 62.23(c), (h)(6). WYO insurers are considered "fiscal agents" of the United States [*see* 42 U.S.C. § 4071(a)(1)], and they must remit all insurance premiums to the Federal Insurance Administrator, excluding funds required to meet current expenditures. *See* 44 C.F.R. Pt. 62, app. A, art. VII(B).

■ Generally, SFIP's should be interpreted in a fashion that ensures uniform interpretation throughout the country, avoiding state-to-state coverage variances. *Carneiro Da Cunha v. Standard Fire Ins. Co./Aetna Flood Ins. Program*, 129 F.3d

---

5. The plaintiffs apparently do not contest Fidelity's motion for judgment on the pleadings. They have not filed a response in opposition to the motion, and during the deposition of Weeden, the plaintiffs' counsel stated, "The motion for the judgment on the pleadings by Fidelity National is well taken, so those issues would be moot."

581, 584 (11th Cir.1997); *Suopys v. Omaha Property & Casualty,* 404 F.3d 805, 809 (3d Cir.2005). Moreover, under the Appropriations Clause of the United States Constitution, entitlement to payment under a SFIP must derive from a federal statute. *See Office of Pers. Mgmt. v. Richmond,* 496 U.S. 414, 424, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). Thus, it is well established that SFIP contracts are interpreted using federal statutory and common law rather than state law, and states have no regulatory control over the NFIP. *Newton v. Capital Assurance Co., Inc.,* 245 F.3d 1306, 1309 (11th Cir.2001)(citing *Carneiro Da Cunha v. Standard Fire Ins. Co./Aetna Flood Ins. Program, supra,* 129 F.3d at 584); *C.E.R. 1988, Inc. v. Aetna Cas. & Sur. Co.,* 386 F.3d 263, 267 (3d Cir.2004); *Sodowski v. National Flood Ins. Program,* 834 F.2d 653, 655 (7th Cir.1987); *West v. Harris,* 573 F.2d 873, 881 (5th Cir.1978); *Levitus v. Omaa Prop. & Cas. Ins. Co.,* Docket No. 3:97cv84/RV (N.D. Fla., May 21, 1997).

In *Linder & Assoc., Inc. v. Aetna Cas. & Sur. Co.,* 166 F.3d 547 (3d Cir.1999), the Third Circuit held:

> "(N)either the statutory nor decisional law of any particular state is applicable to the case at bar ... [W]e interpret the SFIP in accordance with its plain, unambiguous meaning, remaining cognizant that its interpretation should be 'uniform throughout the country' and that 'coverage should not vary from state to state.'" *Id.* at 550 (citing *Carneiro Da Cunha, supra,* 129 F.3d at 585).

 Based on this well established precedent, to the extent that the plaintiffs' complaint alleges that Florida's Valued Policy Law should be applied to interpret the terms of their flood insurance policy, the plaintiffs' claim is preempted by federal law, and Fidelity's motion for judgment on the pleadings will be granted with respect to the Florida Value Policy Law Claim.

## C. *DEFENDANTS' SUMMARY JUDGMENT MOTIONS*

### 1. *Summary Judgment Standard*

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986). *See also Morisky v. Broward County,* 80 F.3d 445, 447 (11th Cir.1996).

However, summary judgment is improper "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.,* 64 F.3d 590, 594 (11th Cir.1995). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id. See also Matsushita*

*Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986).

Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact. *See Leigh v. Warner Bros., Inc.,* 212 F.3d 1210, 1217 (11th Cir.2000); *Ramsey v. Leath,* 706 F.2d 1166, 1170 (11th Cir.1983). On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. *Whatley v. CNA Ins. Cos.,* 189 F.3d 1310, 1313 (11th Cir.1999).

### 2. *Fidelity's Policy: Flood Insurance (Dwelling and Contents Claim)*

Even though Florida's Valued Policy Law does not apply to the plaintiffs' flood insurance policy, the plaintiffs' breach of contract claim is also based on the allegation that Fidelity did not pay the full amount of damages caused by flooding. In particular, the plaintiffs argue there was a breach of contract because Fidelity only paid out $71,456.90 for damage to the dwelling (which was purportedly inadequate) and did not tender any payment at all for damage to the personal property. With respect to this claim, Fidelity contends that the plaintiffs are barred from seeking additional damages based on their flood insurance policy because the plaintiffs failed to satisfy a procedural prerequisite in handling their claim. Specifically, the SFIP issued to the plaintiffs requires that a proof of loss be submitted by the insured within 60 days of the loss.[6] A proof of loss is defined as a "statement as to the amount you are claiming under the policy signed and sworn to by you." SFIP, § O, Art. 8. It also must include certain information necessary for the insurance company to process the claim. The policy further warns the insured that they are required to submit a proof of loss even if the adjuster acting on behalf of the WYO company does not provide them with a form.

■ Satisfaction of the proof of loss requirement is a condition precedent to recovery under a SFIP, which must be strictly construed. *See Sanz v. U.S. Security Insur. Co.,* 328 F.3d 1314, 1318 (11th Cir.2003); *Suopys v. Omaha, supra,* 404 F.3d at 810; *Dawkins v. Witt,* 318 F.3d 606 (4th Cir.2003); *Mancini v. Redland Insur. Co.,* 248 F.3d 729, 733–34 (8th Cir. 2001); *Flick v. Liberty Mut. Fire Ins. Co.,* 205 F.3d 386 (9th Cir.2000); *Gowland v. Aetna,* 143 F.3d 951, 955 (5th Cir.1998); *M.D. Phelps v. FEMA,* 785 F.2d 13 (1st Cir.1986). Thus, substantial compliance is not enough, and an insured must completely satisfy the proof of loss requirement, including the requirement that the statement is signed and sworn, before an insured can receive benefits under a SFIP. *Sanz, supra,* 328 F.3d at 1317.

Plaintiffs have not filed a formal opposition to Fidelity's motion for summary judgment. Instead, in an apparent attempt to refute the proof of loss defense, the plaintiffs have filed the affidavits, e-mail, and other evidence noted in section

---

**6.** Upon a flood loss occurring to insured property, Section O of Article 8 of the SFIP required the plaintiff to:

[w]ithin 60 days after the loss, send the Insurer a proof of loss, which is the Insured's statement as to the amount it is claiming under the policy signed and sworn to by the Insured and furnishing the following information ... [t]he actual cash value of each damaged item of insured property and the amount of damages sustained.

II.A above. Although not articulated as such, by this evidence the plaintiffs may be attempting to argue that: i) they complied substantially with the spirit, if not letter, of the proof of loss requirement by giving Fidelity notice, ii) Fidelity waived the proof of loss defense by paying part of the claim, and/or iii) Fidelity is estopped from asserting the proof of loss requirement as a ground for denying the plaintiffs' claim. Each argument will be considered, and ultimately rejected, below. I do not reach this decision lightly or without reservation, however. In all fairness, it appears undisputed that the plaintiffs' contents and personal property were damaged by the flood water, thus bringing the loss within the ambit of the SFIP. Moreover, despite representations to the contrary made by Fidelity during the March 2006 summary judgment hearing, the evidence reveals Fidelity did in fact have both notice and an itemization of the personal property damage. Nonetheless, the law is clear and well established that summary judgment must be granted for Fidelity.

■ *a. Substantial Compliance.* It is axiomatic that an insured must fully and strictly satisfy the proof of loss requirement, including the requirement that the statement be signed and sworn. *Sanz, supra,* 328 F.3d at 1314. On the facts of this case, there can be no argument that Mr. Greer's e-mail correspondence (or preceding telephone conversation with Fidelity) constituted a valid proof of loss. To be sure, the evidence reveals the e-mail and attached itemization were not signed and sworn, nor do the plaintiffs claim that it was. *See* Greer Depo, p. 76–81 (in which

Mr. Greer stated he did not "recall getting any documents notarized" and that he only provided Fidelity with a list of the estimated costs of repair for personal and real property); *see also* Doc. 137, Greer Affidavit (affirming that he emailed an itemized list "to Mr. David Edwards as a basis of 'Proof of Loss'"). E-mailing Fidelity a list of the damaged property, even if intended to serve "as a basis" for a proof of loss, does not satisfy this condition precedent to suit.

As to this issue, the Eighth Circuit opinion in *Mancini v. Redland Insur. Co., supra,* 248 F.3d at 729 is highly instructive. The insureds in that case suffered a covered loss and thereafter faxed to the insurer a number of itemized forms (none of which were signed or notarized; however, the fax transmittal sheet did carry the insureds' printed names). The district court held that the insureds "believed that, by submitting the forms to [the insurer] accompanied by a transmittal letter bearing their printed names, they had signed and sworn to the proof of loss." *Id.* at 732–33. The Eighth Circuit reversed, finding that even though the insureds provided the information requested of them, the forms were not "signed and sworn" as required and thus there was not strict compliance. The court held: "Given the special nature of this policy, the [insured] must show actual and complete compliance with this requirement: it is not sufficient to show that they substantially complied or that the insurer suffered no prejudice." *Id.* at 734 (citations omitted). Accordingly, any argument for substantial compliance must fail.[7]

■ *b. Waiver.* Next, the plaintiffs may be arguing that Fidelity waived the

---

**7.** Although not itself binding authority, it is noteworthy that *Mancini* was cited with approval several times by the Eleventh Circuit in *Sanz, supra,* 328 F.3d at 1314, thus strongly suggesting the Eleventh Circuit would adopt its specific holding on this score. Indeed, *Mancini* was cited recently in *Bruinsma v. State Farm Fire & Casualty Co.,* 410

proof of loss requirement by processing and, in fact, paying out a portion of their claim. The Eleventh Circuit has made clear, however, that a waiver argument is viable in this context only where there is an actual *written* waiver from the Federal Insurance Administrator [*see Sanz, supra,* 328 F.3d at 1318–19], a circumstance not present here. Other courts have agreed. For example, the insured in *Jamal v. Travelers Lloyds of Texas Ins. Co.,* 131 F.Supp.2d 910 (S.D.Tex.2001) argued that his insurance company waived the proof of loss defense because it paid out part of the claimed damages; specifically, the insurer there paid the full policy for the contents coverage, but only part of the damages for the actual dwelling. The district court rejected the argument and held: "The fact that TPCIC paid Jamal a portion of the money he now seeks does not, as he contends, constitute an express, written waiver by the Federal Insurance Administrator." *Id.* at 918; *accord Rojek v. Federal Emergency Management Agency,* 234 F.Supp.2d 999, 1002–05 (S.D.Iowa 2002) (making partial payment under SFIP does not constitute waiver or preclude a proof of loss defense).

■ *c. Estoppel.* Lastly, there is the question of whether Fidelity may be estopped from asserting a proof of loss de-

fense. The answer to this question is also found in *Sanz.* There, although the Eleventh Circuit was reluctant to hold that estoppel can never be asserted against the government in the context of an SFIP, the court made clear that estoppel is the exception rather than rule and warranted only in extreme cases where "affirmative and egregious misconduct by government agents exists." *Sanz, supra,* 328 F.3d at 1319–20. Plaintiffs have not alleged, nor does the record suggest, there was any such "affirmative and egregious" misconduct by Fidelity.[8]

In light of the foregoing, Fidelity's motion for summary judgment based on the plaintiffs' failure to submit a proof of loss in compliance with the policy requirements must be granted.

### 3. Owners' Policy: Florida's Valued Policy Law Claim

Because of the damages that their home suffered as a result of Hurricane Ivan, the plaintiffs contend that Florida's Valued Policy Law [Fla. Stat. § 627.702(1)] also requires Owners to pay the full face amount of the plaintiffs' policy, rather than just the cost of repairing damage caused by windstorm. Section 627.702 of the Florida Statutes, in effect at the time plaintiffs' home was damaged, provided:

---

F.Supp.2d 628 (W.D.Mich.2006) for the position that "failure of the insured to submit a *signed* and *sworn* statement of the amount claimed ... [will divest] the insured of the right to sue" and, furthermore, "*all other federal courts to face the question have agreed.*" *Id.* at 634 (emphasis added) (citing multiple cases); *accord Gowland, supra,* 143 F.3d at 953–54 (substantial compliance argument rejected where an insured provided the information required under the proof of loss provision, however the statement claim was not sworn; holding "an insured's failure to provide a complete, sworn proof of loss statement, as required by the flood insurance poli-

cy, relieves the federal insurer's obligation to pay what otherwise might be a valid claim").

**8.** At most, the plaintiffs may be arguing Fidelity provided misinformation and failed to advise them of the proof of loss requirement. These factors, coupled with a partial payment of a claim, have been held by one court to be sufficient to justify estoppel. *See generally Meister Bros., Inc. v. Macy,* 674 F.2d 1174 (7th Cir.1982). Notably, however, the Eleventh Circuit has expressly disagreed with and declined to follow *Meister Bros.* on this point. *Sanz, supra,* 328 F.3d at 1318 n. 6.

"In the event of the total loss of any building, structure, ... located in this state and insured by any insurer as to a covered peril, the insurer's liability, if any, under the policy for such total loss, shall be the amount of money for which such property was so insured as specified in the policy and for which a premium has been charged and paid." § 627.702(1), *Fla. Stat.* (2003).

Section 627.702 is triggered only when an insured building is rendered a "total loss" as defined by Florida courts. Thus, in order for the plaintiffs' claim to fall within the scope of Florida's Valued Policy Law, the plaintiffs must first establish that there was a "total loss" of an insured building. The principal object of Florida's Valued Policy Law is to fix the measure of damages in case of a total loss. *Springfield Fire and Ins. Co. v. Boswell,* 167 So.2d 780 (Fla. 1st DCA 1964).

The Supreme Court of Florida long ago adopted the "identity test" to determine whether a building is an actual "total loss." *Lafayette Fire Ins. Co. v. Camnitz,* 111 Fla. 556, 560–561, 149 So. 653, 654–655 (Fla.1933). The identity test looks to see whether the building:

"has lost its identity and specific character as a building, and becomes so far disintegrated, it cannot be possibly designated as a building, although some part of it may remain standing. It matters not that some debris remains which may be useful or valuable for some purposes." *Id.*

■ Thus, the total loss of a building, for purposes of Florida's Valued Policy Law, means the total loss of the building, but not necessarily the absolute extinction of all its materials, or even that no part of it is left standing.[9]

■ In addition to the identity test, a building may be deemed a total loss, within the scope of the statute, if it is rendered a constructive total loss. A constructive total loss occurs when a building, although still standing, is damaged to the extent that ordinances or regulations in effect at the time of the damage actually prohibit or prevent the building's repair, such that the building has to be demolished. *Netherlands Ins. Co. v. Fowler,* 181 So.2d 692, 693 (Fla. 2d DCA 1966).

In applying the "identity test" to the facts of this case, the undisputed evidence shows that after Hurricane Ivan, the plaintiffs' home plainly did not lose its identity and specific character as a building, nor had it become so far disintegrated that it could not properly be designated as a building. The pictures of plaintiffs' home reveal that the windows and the doors were not broken during the hurricane, and all of the walls remain intact. While the roof sustained minor damage, it is still wholly intact and attached to the building, minus some shingles. Further, Owners' expert, Sheehan, found that the plaintiffs' home was structurally sound, and he observed no damage to the foundation or exterior walls due to either wind or flood. There is no admissible evidence in the

---

9. Plaintiffs contend that this court should apply the "prudent man" test, which focuses on whether a "reasonably prudent and uninsured owner, desiring such a structure as the one in question was before it was injured would in proceeding to restore the building to its original condition, utilize such remnant as such basis." *See* Doc. 163, p. 25, citing *National Union Fire Ins. Co. of Pittsburgh, Pa., v. Richards,* 290 S.W. 912 (Tex.Civ.App.Waco 1927). Even if Florida had adopted this test, which it has not, as discussed *infra,* the plaintiffs have not established that a reasonably prudent person would not use the existing structure to rebuild the home *as it was before* the hurricane.

record to dispute the defendant's assessment. While some of the interior walls and cabinetry accumulated mold where the flood waters had come into the home, some of the other rooms still appeared to be in overall good condition. Accordingly, Sheehan opined that the plaintiffs' home was easily repairable, and, in fact, should have been repaired in a timely fashion.

Thus, the center of this dispute essentially hinges on whether the plaintiffs' home was rendered a constructive total loss as a result of Hurricane Ivan. It is true that the Escambia County Building Inspections Department determined, at the plaintiffs' request, that the plaintiffs' home was "substantially damaged" because the estimated cost of repairs exceeded 50% of the market value of the plaintiffs' home.[10] Therefore, the plaintiffs may be required to rebuild or repair their home in compliance with current building codes and regulations, including complying with current flood elevation requirements. As Owners points out, however, this determination by itself does not necessarily render the plaintiffs' home a constructive total loss. Rather, a constructive total loss occurs only if an ordinance or regulation in effect at the time of the damage to the plaintiffs' home actually prohibits or prevents them from repairing the house, such that it has to be demolished. *Netherlands Ins. Co. v. Fowler, supra,* 181 So.2d at 693.

A "substantial damage" determination does not require demolition or prevent repair.

Here, the Escambia County Building Inspector and Sheehan both explained that there were no applicable regulations that would require the plaintiffs to demolish their home. On the contrary, Sheehan explained that the damage to the plaintiffs' home could be repaired in accordance with applicable building codes and flood plain regulations, and the estimated repairs set forth in Owners' cost estimate would bring the home into compliance with applicable building code requirements in existence at the time that the plaintiffs filed this claim. At the time of the loss, the plaintiffs' home was located in a flood zone that was satisfied by the present elevation of the plaintiffs' home of 8.2 feet. Further, the record reflects that the house sustained no structural or foundational damage.

The plaintiffs suggest that the testimony of their contractor, Rankin, provides evidence that their home was a constructive total loss after Hurricane Ivan. However, contrary to the plaintiffs' assertion, Rankin did not say that. Rather, Rankin only explained that if a home is found to be fifty percent damaged, and it is built on a slab, as the plaintiffs' home is, and the elevation must be brought up to a current, higher flood elevation standard, then "basically

10. Owners strongly disputes the Building Inspection Department's finding of substantial damage. Pursuant to the 2001 Florida Building Code, Section 3401.7, a substantial damage determination must be based on a comparison of the repair costs to the "market value" of the structure before the damage occurred. Here, the Building Inspections' Department based its determination by using the adjusted tax assessed value of the home, $95,000, which Owners argues is much lower than the actual market value. *See Empire State Insur. Co. v. Chafetz,* 278 F.2d 41 (5th Cir.1960). In this case, the plaintiffs have owned their home for over twenty years, and in accordance with Section 193.155(1) of the Florida Statutes, the tax assessed value of the plaintiffs' property may only be increased on an annual basis by, at the most, three percent. Regardless of how the assessed value was determined, there is no doubt that the tax assessed value greatly understates the true market value of the plaintiffs' home, which consists of over 2500 square feet in a highly desirable waterfront community.

you have to just bulldoze the house." *See* Rankin Depo, p. 24. He was speaking in general terms of any house that had to be elevated to meet the current flood elevation requirements. In such a case, Rankin opined, it would be cost efficient to simply demolish the home and start over. However, Rankin admitted that he did not have any knowledge of Escambia County requiring the plaintiffs to elevate their home or to have it demolished.

Significantly, the evidence in the record indicates that despite the absence of any building regulation preventing plaintiffs from repairing their home, plaintiffs determined unilaterally to demolish and rebuild their house, in part, to make improvements to the home which went well beyond the scope of construction necessary to bring the home into compliance with current regulations. For example, Mr. Greer explained that "it would be foolish to repair or rebuild (his home) without planning construction to handle a 13 to 15 foot tide we experienced." *See* Doc. 108–11, Greer Affidavit.[11] Mr. Greer reiterated his plans in a letter dated February 16, 2005, to the Small Business Association, where he stated, "Our preference is to rebuild a structure which would be able to withstand both tidal surges and wind velocity from similar or greater storms in the future." To this end, the plaintiffs submitted plans which included the use of "hurricane stressed" materials, and a main living area on a second floor, even though the plaintiffs' home is currently only one story.

Notwithstanding the plaintiffs' plans to improve their home, Mr. Greer was informed that the damage to his home did not warrant demolition. For example, in response to Mr. Greer's proposed improvements, as well as the corresponding request for an increased loan amount, the SBA adjuster characterized the Greers' plans to demolish and rebuild the home as "hazard mitigation measures," and reminded the plaintiffs "without condemnation, code requirements, or a structural engineer report requiring demolition and rebuild, the damage to the structure will not warrant a reconstruction." Again, in a letter dated April 6, 2005, the SBA adjuster specifically informed the plaintiffs that the "substantial damage" letter from the Escambia County Building Inspection's Department "does not stipulate that elevation is a requirement to be in compliance with the Florida Building Code, Escambia County Code of Ordinances and/or Flood Plain Construction Regulations." The SBA adjuster continued, "If the local building officials deny you a building permit, we will need a letter from them." Notably, however, at no time did the plaintiffs attempt to obtain a building permit to repair the home at its current elevation.

In fact, the plaintiffs conceded that it is undisputed that "pursuant to law or ordinance, their home was neither required to be demolished nor condemned, nor do plaintiffs allege such." *See* Doc. 108–1, p. 13–14. Plts.' Resp. to Def. Owners' Statement of Material Undisputed Facts. Instead, the plaintiffs suggest that their home was rendered a constructive total loss because it would be foolish to rebuild the home as it was constructed pre-Hurricane Ivan, when the flood waters exceeded that level during the hurricane. While it might be understandable that the plaintiffs want to rebuild their home in order to

---

**11.** Greer also indicated that Rankin's estimate of repair damage included the cost of elevating the floor, even though at the time of the original loss, no regulation or code required such elevation.

make it more capable of withstanding another flooding event, the test for whether a home is a total constructive loss is not whether the homeowner feels it is desirable to make the home better than it was before the loss.

Rather, the defendants are only responsible for repairing and rebuilding the home to its pre-loss condition, with the exception that the home must be rebuilt in compliance with current building regulations. Thus, absent any regulation or code requiring the plaintiffs to rebuild their home so that it can withstand a 13 to 15 foot tidal surge, the plaintiffs' desire to improve the hurricane durability of their home does not render it a total loss within the meaning of Florida's Valued Policy Law or under the terms of the insurance contract itself. From the record, it is undisputed that the plaintiffs' home was not rendered a total loss following Hurricane Ivan when the "total loss" is properly determined.

Despite the fact that the plaintiffs' home was not rendered a total loss after Hurricane Ivan, however, the plaintiffs now rely upon a newly adopted provision of the Escambia County Building Code in support of their constructive loss claim. It now requires that all new construction within the plaintiffs' flood zone have an elevation three feet above the current elevation requirement. Thus, the new county regulation would require the plaintiffs to elevate their home to 10 feet before rebuilding or repairing, if their home truly was "substantially damaged." The plaintiffs argue that even if their home was not a "total loss" at the time that they filed their complaint, the new law renders it a total loss as of January 10, 2006——the effective date of the revised regulations.

This new regulation does not support the plaintiffs' constructive loss claim.

Most significantly, Florida's Valued Policy Law was amended, effective June 1, 2005, to add the following explanation of legislative intent:

"The intent of this subsection is not to deprive an insurer of any proper defense under the policy, to create new or additional coverage under the policy, or to require an insurer to pay for a loss caused by a peril other than the covered peril. In furtherance of such legislative intent, when a loss was caused in part by a covered peril and in part by a noncovered peril, paragraph (a) does not apply. In such circumstances, the insurer's liability under this section shall be limited to the amount of the loss caused by the covered peril. However, if the covered perils alone would have caused the total loss, paragraph (a) shall apply." § 627.702(c), *Fla. Stat.* (2005)

Further, the statute provides:

(c) It is the intent of the Legislature that the amendment to this section shall not be applied retroactively and shall apply only to claims filed after the effective date of such amendment.

The plaintiffs filed their initial complaint in state court on June 1, 2005. Therefore, the amended version of Florida's Valued Policy Law does not apply to the plaintiffs' initial claim. However, the amended version would apply to any "claim" filed after the effective date of the amendment. Here, the plaintiffs essentially concede that the new ordinance represents a new "claim." For example, as noted earlier, the plaintiffs originally stated that there was no law or ordinance which required their home to be demolished, and that they were not alleging such. *See* Doc. 108–1, p. 13–14. Plts.' Resp. to Def. Owners' Statement of Material Undisputed Facts. The

enactment of the new ordinance, sixteen months after the hurricane damage to the plaintiffs' home and which now forms the basis for plaintiffs' constructive total loss claim, is separate and materially different from the plaintiffs' original allegations. It is based on a new set of facts, specifically the enactment of the new ordinance and its effect on the plaintiffs' home. Thus, even assuming that the plaintiffs' home was "substantially damaged" (which the record does not reflect), the contention that the new ordinance rendered the plaintiffs' home a total loss as of January 10, 2006, represents a new claim. Since the new claim postdates June 1, 2005, the amended version of Florida's Valued Policy Law would apply and expressly preclude the new claims.

Under the amended statute, the "total loss" provision only applies "if the covered perils alone would have caused the total loss." § 627.702(c), *Fla. Stat.* (2005). Here, Owners' insurance contract expressly excludes flooding as a "covered peril." The undisputed evidence establishes that most of the damage to the plaintiffs' home was, in fact, caused by flooding, whereas wind caused relatively minor damage to the plaintiffs' home. For example, Owners' expert determined that the extent of damage caused by wind, as opposed to flooding, was confined to relatively minor parts of the roof, ceiling, and attic insulation, and he estimated that the cost to repair such damage was approximately $15,149.92. While the plaintiffs offer evidence of a higher cost to repair the damage to the roof, ceiling, and attic, they have not submitted any admissible evidence that wind caused damage to any other part of the home. Plaintiffs' contractor explained that he made no attempt to differentiate between the specific causes of the damage to the plaintiffs' home.[12] Accordingly, the undisputed record evidence establishes that the damage to the plaintiffs' home constituted a partial loss, rather than a total loss. As a consequence, the plaintiffs have failed to raise a genuine dispute regarding a material issue, and Owners is entitled to summary judgment that Florida's "Valued Policy Law" [§ 627.702] does not apply to the facts of this case.

### 4. *Owners' Policy: Personal Property*

Owners also moves for summary judgment that Florida's Valued Policy Law

---

12. The plaintiffs argue that there is genuine dispute concerning the extent of damage caused by wind because Greer and Rankin both testified that wind-driven rain came through some of the ridge vents and went into the attic, causing damage to the electrical system. With respect to Greer, he testified at his deposition that it appeared that some wind-driven rain may have come through ridge vents, but he explained concerning the water in his home, "You know, how much of it was wind and how much of it was flood, I don't know." *See* Greer Depo, p. 110. With respect to Rankin, plaintiffs assert in a memorandum that Rankin testified that hurricane driven rain destroyed the electrical system and heating and air conditioning systems. *See* Doc 108, p. 3, Plaintiffs' Response to Def.'s Statement of Undisputed Facts. Although the plaintiffs cite to Rankin's deposition testimony, they have never filed in the record the pages to which they cite. Therefore, there is no evidence in the record that Rankin made those statements. Even if he had, however, Rankin may not offer expert opinion testimony concerning the cause of damage, as he is only a fact witness in this case. Further, in deposition testimony that *was* submitted to this court, Rankin repeatedly explained that he did not make any determination of the cause of the damage to the plaintiffs' home, and he stated that he would not have been qualified to do so. Thus, the speculative statements of Greer, who was not present in the home during the hurricane, do not raise a dispute about the extent of damage caused by wind.

does not apply to plaintiffs' personal property claim. Indeed, the Valued Policy Law itself provides:

"This section does not apply as to personal property or any interest therein, except with respect to mobile homes as defined in s. 320.01(2) or manufactured buildings as defined in s.553.36(12). Nor does this section apply to coverage of an appurtenant structure or other structure of any coverage or claim in which the dollar amount of coverage available as to the structure involved is not directly stated in the policy as a dollar amount specifically applicable to that particular structure." § 627.702(5), Fla. Stat. (2004).

Furthermore, the plaintiffs have offered absolutely no evidence that any of their personal property was damaged by wind. Mr. Greer testified that he had no idea what was damaged by wind versus flooding. On the other hand, Owners' expert determined that the inside of the home was not subjected to high winds, and the only damage caused by windstorm was confined to the roof, ceiling, and attic. The walls, windows, and doors of the home were not damaged by wind and remained fully intact. While the roof lost some shingles, it remained substantially watertight. The record reflects that the contents were damaged solely by flood water. The plaintiffs have offered no admissible evidence to dispute this fact. Therefore, Owners is entitled to summary judgment that it is not liable for damage to or loss of the plaintiffs' personal property.

### 5. *Owner's Policy: Other Structures Coverage*

Owners also seeks summary judgment that the plaintiffs are not entitled to recover damages under the "Other Structures"

provision of the insurance policy. On the other hand, the plaintiffs argue that they are entitled to summary judgment that the "Other Structures" coverage should be allocated to the Dwelling Coverage to pay to rebuild the home itself. In describing the scope of coverage under Coverage B–Other Structures, Owners' policy explains:

If the replacement cost of all structures covered under (1)(a) above is less than the limit of insurance, we will add the excess amount to the *limit of insurance* for Coverage A—Dwelling. If there are no other structures, we will add the limit of insurance for this coverage to the limit of insurance for Coverage A—Dwelling. This provision applies only if loss or damage to your dwelling exceeds the limit of insurance for Coverage A—Dwelling and you repair or replace the damaged property and the amount you actually and necessarily spend exceeds the limit of insurance for Coverage A—Dwelling.

Accordingly, the policy provision provides that the coverage for structures, which totals $20,200, may be used to increase the total coverage for a dwelling if certain conditions are met. Initially, the replacement costs of all structures must be less than the limit of insurance. If so, then the Structure Coverage will be added to the Dwelling Coverage if: (1) the loss or damage to the dwelling exceeds the limits of Coverage A; (2) the plaintiffs repair or replace the damage; and (3) the amount the plaintiffs actually and necessarily spend exceeds the Dwelling Coverage limit.

The plaintiffs did not incur any substantial damage to an additional structure, as defined in the policy, due to Hurricane Ivan. Nevertheless, as explained ear-

lier, the plaintiffs' home is not a total loss, and even accepting the plaintiffs' cost-repair estimate of the damage caused by windstorm as true, the total cost would not exceed $202,000, which represents the limits of insurance for the dwelling. Therefore, under the terms of the plaintiffs' policy, the plaintiffs' claim does not fall within the scope of the policy's "Other Structures" coverage, and Owners is entitled to summary judgment that the plaintiffs' claim does not fall within the scope of the "Other Structures" coverage under the terms of the policy.

### D. PLAINTIFFS' SUMMARY JUDGMENT MOTION

As noted above, the plaintiffs move for summary judgment that Florida's Valued Policy Law applies to the plaintiffs' claim and that the "other structures" coverage should be added to the dwelling coverage. For the reasons discussed above, the plaintiffs' motion for summary judgment regarding those issues must be denied. The plaintiffs also move for summary judgment on the basis of a policy endorsement, titled "Building Ordinance or Law Endorsement," which provides:

"1. Settlement of loss or damage to covered property caused by any PERILS WE INSURE AGAINST shall include costs necessary to meet any applicable ordinance or law:

a. regulating the construction, use, or repair: or

b. requiring the demolition, including costs of debris removal;

of the insured dwelling. In no event shall our payment of these costs exceed

25% of the limit of insurance stated in the Declarations of Coverage A–Dwelling.

2. The provisions of 1. above, shall apply only to repairs of the damaged portions of the insured dwelling unless the total damage to such dwelling exceeds 50% of the replacement cost of the dwelling."

3. In no event shall our payment under the provisions of this endorsement be increased because of the provisions of any other endorsement attached to this policy that may increase the Coverage A—Dwelling limit of insurance stated in the Declarations.

The plaintiffs paid an additional premium for this endorsement coverage, which constitutes additional coverage over and above the dwelling coverage set forth on the declarations page. Thus, the plaintiffs contend that they are entitled to summary judgment that this endorsement applies, and that Owners is liable for any costs they incur in replacing their dwelling over the coverage limits of the policy.

██ Based on the unambiguous language of the endorsement, it applies only to loss or damage caused by perils in which Owners insures against.[13] It does not apply to flood damage. Accordingly, it would only apply to increased costs incurred in repairing the plaintiffs' roof and wind damaged parts of the house in order to meet a current ordinance or regulation. There is no evidence in the record to render this endorsement applicable to the plaintiffs' claim. Therefore, the plaintiffs' motion for summary judgment on this basis must be denied.

**13.** Since the building is not a "total loss," Florida's Valued Policy Law would not affect

the exclusionary clause of this endorsement.

## III. CONCLUSION

For the foregoing reasons, the plaintiffs' motion for summary judgment (Doc. 63) is DENIED. Defendant Fidelity's motion for judgment on the pleadings (Doc. 37) is GRANTED. Defendant Fidelity's motion for summary judgment (Doc. 69) is GRANTED. Defendant Fidelity's motion to strike (Doc. 141) is DENIED as moot. Defendant Owners' motion for partial summary judgment (Doc. 45) is GRANTED.

In light of the above rulings, the only remaining viable issue in this case is the amount of actual damages to the plaintiffs' residence caused by wind and whether Owners has fully paid that amount.[14]

---

14. From the evidence in the record, there is a very strong inference that Owners has, in fact, paid the windstorm damage in full, but the filed motions do not encompass that issue.

Plaintiffs' pending Motion for Leave of Court to File Amended Complaint (Doc. 125) has been taken under advisement and will be ruled upon in a separate Order.