# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 17, 2009

Charles R. Fulbruge III
Clerk

No. 07-31149

TARA MONISTERE; BRANDON MONISTERE

Plaintiffs-Appellees

v.

STATE FARM FIRE AND CASUALTY COMPANY

Defendant-Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JONES, Chief Judge, and OWEN and SOUTHWICK, Circuit Judges.

Leslie H. Southwick, Circuit Judge:

This litigation concerns a home located in Metairie, Louisiana that was severely damaged in 2005 by Hurricane Katrina. State Farm Insurance Company issued a flood insurance policy to Tara and Brandon Monistere pursuant to the National Flood Insurance Program. The Monisteres were unsatisfied with the amount paid under the policy and filed suit. The district court entered judgment in favor of the homeowners for the full policy amount after applying a legal theory occasionally used to determine coverage under certain private insurance policies. That theory is inapplicable to this federal program. We REVERSE and RENDER judgment in favor of State Farm.

## I. FACTS AND PROCEDURAL BACKGROUND

The Monisteres maintained a flood policy on their home. State Farm issued them a standard flood insurance policy in which coverage is provided by the federal government. On August 29, 2005, Hurricane Katrina caused substantial damage to their home. What is at issue is the appropriate amount to be paid under the policy.

The State Farm policy contained four separate coverages on the home, only two of which are relevant in this appeal: (1) building coverage ("Coverage A"), which has a $227,600 limit; and (2) increased cost of compliance coverage ("Coverage D"), which has a $30,000 limit under the policy.

In the aftermath of Hurricane Katrina, State Farm sent an adjuster, Michael Boudreaux, to inspect the property. Boudreaux's initial estimate was $231,812.93. State Farm asserts this figure was simply the pre-storm value of the home.[1] One week later, Boudreaux issued an estimate of $133,212. State Farm paid the Monisteres that amount, less a $500 deductible.

After receipt of payment, the Monisteres provided State Farm with estimates of their own. The Monisteres submitted an estimate from Whites & Whites Redevelopment Corporation, dated November 8, 2005, which determined that repairs would cost $154,843. In January 2007, Whites & Whites revised its

---

[1] The parties take different positions on the relevance of Boudreaux's initial estimate. The Monisteres argue that Boudreaux's estimate supports their position that their "direct physical loss" exceeded the policy's limits. Tara Monistere testified at trial that Boudreaux assured her that the home would be deemed a total loss. State Farm contends that Boudreaux's initial estimate revealed his assessment of the replacement cost of the structure, not merely the "direct physical loss." Boudreaux testified about this. Even assuming that the district court made a credibility determination on this point, we find Boudreaux's actions immaterial. The ultimate burden to prove damage fell on the Monisteres, not State Farm. 44 C.F.R. pt. 61, app. A(1)(J)(7) ("The insurance adjuster whom we hire to investigate your claim may furnish you with a proof of loss form, and she or he may help you complete it. However, this is a matter of courtesy only, and you must still send us a proof of loss within 60 days after the loss even if the adjuster does not furnish the form or help you complete it.").

estimate, which was now $171,638. State Farm never re-evaluated the premises nor paid out any additional amount under Coverage A.

In January 2006, the Department of Emergency Management for Jefferson Parish, Louisiana, where this property is located, issued a "Substantial Damage Determination" letter on the home. Under Federal Emergency Management Agency requirements, such a determination meant the home would have to be rebuilt to a new height before future flood insurance could be obtained. State Farm paid the full amount of the $30,000 compliance coverage provided under the policy. Compliance costs were far more than that.

It was determined that the damaged structure could not feasibly be raised. As a result, the Monisteres obtained an estimate from Highland Homes for demolishing the old home and building a new one that would comply with elevation requirements. The estimate was for $477,692. A demand was made for the remainder of the amount of Coverage A under the policy, which compensated for physical losses to the premises. State Farm refused, notifying the Monisteres that nothing more was owed under that coverage. An entirely new home was eventually built at a cost of about $535,000.

In August 2006, the Monisteres brought suit in United States District Court for the Eastern District of Louisiana. A bench trial was held in November 2007. Both of the Monisteres testified. Also testifying were Jefferson Parish's building permit manager and the Parish's flood plain manager/community rating system coordinator. The undisputed testimony was that the Monisteres were forced to demolish and rebuild their home in order to comply with FEMA regulations. Two State Farm adjusters assigned to the Monisteres' case, Michael Boudreaux and David Andras, testified. Their testimony discussed the costs required to repair the damaged portions of the Monisteres' home.

The district court, after hearing all of the testimony, entered judgment in favor of the Monisteres. There was no written opinion in the case. Instead, oral

reasons were announced from the bench. An award was made of the remainder of the amount available under Coverage A, or $86,787.34. Legal interest from the date of judgment was to be paid. State Farm timely appealed.

## II. DISCUSSION

As we noted previously, the Monisteres' Standard Flood Insurance Policy was purchased under the National Flood Insurance Program. The program is controlled by federal regulations. *See* 44 C.F.R. § 61.4. A standard policy appears in the regulations. *Id.* at pt. 61, app. A(1). We will refer to the regulations and the policy somewhat interchangeably, but it is critical in our analysis that the source for these obligations and restrictions is federal law. Our review of a district court's interpretation of a statute or regulation is *de novo*. *Teemac v. Henderson*, 298 F.3d 452, 456 (5th Cir. 2002).

### A. *The district court's mode of analysis*

The district court concluded that the Monisteres were entitled to an award of $86,787.34. This was the amount available under Coverage A of the Monisteres' policy after deducting what State Farm already paid. We review the method by which that amount was calculated.

Article VII(V)(2) of the Monisteres' policy establishes the means of calculating compensable damages in the event of flood loss:

> A. We will pay to repair or replace the damaged dwelling after application of the deductible and without deduction for appreciation, but not more than the least of the following amounts:
>
> (1) The building limit of liability shown on your declarations page;
> (2) The replacement cost of that part of the dwelling damaged, with materials of like kind and quality and for like use; or
> (3) The necessary amount actually spent to repair or replace the damaged part of the dwelling for like use.

The Monisteres' "building limit of liability," also known as Coverage A, was capped at $227,000 for "direct physical loss." *See* 44 C.F.R. pt. 61, app. A(1), art.

III(A). "Direct physical loss" is defined under the policy as "[l]oss or damage to insured property, directly caused by a flood. There must be evidence of physical changes to the property." *Id.* at art. II(A)(12).

In determining the Monisteres' "direct physical loss," the district court utilized the judicially created "constructive total loss doctrine." *See Greer v. Owner's Ins. Co.*, 434 F. Supp. 2d 1267, 1279 (N.D. Fla. 2006). In *Greer*, it was said that a "constructive total loss occurs when a building, although still standing, is damaged to the extent that ordinances or regulations in effect at the time of the damage actually prohibit or prevent the building's repair, such that the building has to be demolished." *Id.*[2] Applying this definition, the district court awarded the Monisteres their building coverage limits, holding that the home "was rendered a constructive total loss by the flood damage, because [the court was] convinced that *requiring them to elevate the home . . .* , plus the cost to repair it, could have clearly and easily exceeded the market value of the home pre-Katrina." The court justified this conclusion based on the evidence, "on logic, [and] on common sense."

The district court's common sense view did not give sufficient meaning to the regulations that control us. Certainly, the Monisteres were required to (re)build at a higher elevation. The very real costs associated with that requirement are covered only to the extent permitted by policy and regulatory language. We have already quoted the relevant policy language. Payment for direct physical losses – the coverage under which the additional amounts were awarded below – are made for the *lesser* of the coverage limit ($227,600), the replacement cost of that part of the dwelling damaged (depends on adequately documented proof of loss, the largest timely submitted being about $155,000, and the evidence to support that amount), or the amount actually spent to repair

---

[2] The *Greer* court did not apply the "constructive total loss doctrine" but simply discussed the doctrine and explained why it did not apply. *Greer*, 434 F. Supp. 2d at 1279-83.

(building an entirely new home cost $535,000). Article VII(V)(2) of the policy; 44 C.F.R. pt. 61, app. A(1)-(2)(J)(4), art. II(A)(12). By utilizing the "constructive total loss doctrine," the district court overrode these requirements.[3]

The home was effectively a total loss, but that was due to the costs that regulatory authorities imposed for rebuilding. Such costs were specifically addressed in Coverage D of the Monisteres' policy, capped at $30,000. The Monisteres concede that they were paid the full amount of compliance coverage. The district court was without authority to balance equities – Congress did that ahead of time and determined the maximum amount that would be paid. *See Thomas v. Standard Fire Ins. Co.*, 414 F. Supp. 2d 567 (E.D. Va. 2006) (finding that increased cost of compliance under Coverage D should not be considered in determining what constitutes a "direct physical loss" under Coverage A).

Our analysis is channeled by the requirement that a policy of "insurance issued pursuant to a federal program must be strictly construed and enforced . . . ." *Gowland v. Aetna*, 143 F.3d 951, 954 (5th Cir. 1998). Because insurance companies act as "fiscal agents" of the government under the National Flood Insurance Program, all policy awards deplete federally allocated funds. *In re Estate of Lee*, 812 F.2d 253, 256 (5th Cir. 1987). Therefore, "'not even the temptations of a hard case' will provide a basis for ordering recovery contrary to the terms of a regulation, for to do so would disregard 'the duty of all courts to observe the conditions defined by Congress for charging the public treasury.'"

---

[3] It is of some moment also that the "constructive total loss doctrine" finds support only in value policy cases involving local ordinances. *E.g., Hart v. N. British & Mercantile Ins. Co.*, 162 So. 177 (La. 1935); *Palatine Ins. Co. v. Nunn*, 55 So. 44 (Miss. 1911). In those cases, courts applied the doctrine and held that repair damages are inadequate when a local law prevents an insured from repairing a damaged structure. The idea is that, for sake of equity, the insured should not be forced to absorb compliance costs. Comment, Scott Edwards, *The Wind and the Waves: The Evolution of Florida Property Insurance Law in Response to Multiple-Causation Hurricane Damage*, 34 FLA. ST. U. L. REV. 541, 543-46 (2007). These flood policies are not "value polices." 44 C.F.R. pt. 61, app. A(1), art. II(B)(28).

*Forman v. Fed. Emergency Mgmt. Agency*, 138 F.3d 543, 545 (quoting *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 420 (1990)).

Because we are reversing the judgment in favor of the Monisteres, the issue arises of whether to enter judgment here or instead to remand for further proceedings. State Farm asks us to hold that the Monisteres are not entitled to anything more than what has already been paid under the policy. Conversely, the Monisteres have made an alternative argument on appeal that they should receive $38,925.34, which is the difference between what they were paid and the 2007 Whites & Whites estimate. The issue of awarding a lesser amount as an alternative was presented by the Monisteres in the district court, and thus is properly before us. We resolve this dispute by looking to the procedures and requirements for loss recovery under the regulations.

## B. *Loss recovery under the regulations*

The National Flood Insurance Act and the regulations created standard requirements for submitting proof of a flood loss. However, following the widespread devastation that resulted from Hurricane Katrina, the Acting Federal Insurance Administrator altered the usual rules in an August 31, 2005 memorandum. Contemplating a shortage of qualified adjusters, the memorandum cited "an urgent need to expedite claims payments to policyholders." To accomplish this goal, the Administrator waived the proof of loss requirement in cases where policy holders agreed with the insurance carrier's adjustment. When there was not acceptance, the policy memo placed the homeowner back into the usual process, with a few exceptions:

> I am waiving the requirement in VII.J.4 of the SFIP . . . for the policyholder to file a proof of loss prior to receiving insurance proceeds. Instead, payment of the loss will be based on the evaluation of damage in the adjuster's report . . . .
> In the event a policyholder disagrees with the insurer's adjustment, settlement, or payment of the claim, a policyholder may submit to the insurer a proof of loss within one year from the date

of the loss. The proof of loss must meet the requirements of VII.J.4 of the SFIP . . . . The insurer will then process the policyholder's proof of loss in its normal fashion. If the insurer rejects the proof of loss in whole or in part, the policyholder may file a lawsuit against the insurer within one year of the date of the written denial of all or part of the claim as provided in VII.R of the SFIP . . . .

See *Marseilles Homeowners Condo. Ass'n v. Fid. Nat'l Ins. Co.*, 542 F.3d 1053, 1055 (5th Cir. 2008).

It is undisputed that the Monisteres disagreed with State Farm's offer. The November 2005 estimate was given to State Farm. A proof of loss was later filed on August 28, 2006, just within the one-year deadline. The 2006 document claimed about $94,000 more in compensation.

Since State Farm's initial assessment of damage was not accepted by the Monisteres, the Acting Federal Insurance Administrator's memorandum provided that their claim would thereafter be processed basically in the usual way. That usual way is for a policy holder to supply the insurance carrier with the following information:

[S]end us a proof of loss, which is your statement of the amount you are claiming under the policy signed and sworn to by you, and which furnishes us with the following information:

. . .

f. Specifications of damaged buildings and detailed repair estimates

. . . .

44 C.F.R. pt. 61, app. A(2)(J)(4). After receiving the proof of loss, the insurance carrier, at its option, also may request additional information:

2. We may request, in writing, that you furnish us with a complete inventory of the lost, damaged or destroyed property, including:

    a.    Quantities and costs;

    b.    Actual cash values or replacement cost (whichever is appropriate);

    c.    Amounts of loss claimed;

    d.    Any written plans and specifications for repair of the damaged property that you can reasonably make available to us; and

e.     Evidence that prior flood damage has been repaired.

*Id*. at (K)(2).

State Farm never requested additional information. The first question is whether the Monisteres' proof of loss was initially supported by "detailed repair estimates." Three estimates appear in the record: (1) a November 8, 2005 estimate from Whites & Whites Redevelopment Corporation in the amount of $154,843; (2) a June 20, 2006 estimate from Highland Homes in the amount of $477,692; and (3) a January 25, 2007 estimate from Whites & Whites in the amount of $171,638. Each of those included an estimate of all the damages. The money already received from State Farm ($132,712) would be deducted from any further payment, and the amount paid would be capped by the policy limit. Both Whites & Whites estimates set forth the same areas to be repaired or replaced. The Monisteres explain that the January 2007 estimate includes some items that were overlooked in the November 2005 estimate, and it also incorporates market increases in the cost of construction.

We note that the Highland Homes estimate could not have satisfied the documentation requirement, as it is not an estimate for repairs. It was issued in order to determine the demolition cost of the old home and the proposed price of building a new one. The later of the two Whites & Whites estimates, which is dated January 25, 2007, was furnished more than one year after the date of loss. As we discussed, the usual 60-day deadline for presenting a proof of loss was extended to one year from the date of the loss. The 2007 estimate was well after that, though it is argued that the policyholder was merely submitting a revised estimate reflecting inflation-caused increases in repair costs.

The earliest estimate is dated November 8, 2005. It listed twenty-three areas that required repair or replacement and, for each, stated a cost estimate made by Whites & Whites to the Monisteres. To give a sense of the document, we show the caption and list the first three items:

Work Description
Project - Gut storm-damaged portions of 604 Atherton Dr. and renovate.

| | |
|---|---|
| 1. Gut 1st floor entirely and 2nd floor as required (wiring and HVAC, at a minimum). | $ 9,000.00 |
| 2. Steam clean upstairs carpets | $ 300.00 |
| 3. Mold Remediation | $ 4,000.00 |

A clear line has not been drawn in this Circuit between what is and what is not sufficient detail for the repair estimate. We do not draw one today. The estimate here does provide more detail than those we have previously held inadequate. *See Wright v. Allstate Ins. Co.*, 415 F.3d 384, 386-89 (5th Cir. 2005); *Forman*, 138 F.3d at 545. State Farm eschews reversal based on an argument that the document was not a "detailed repair estimate." We were informed by letter after briefing was closed that "State Farm desires to make clear that it is not making any argument in this case as to the sufficiency of the documentation that had been submitted by the Plaintiffs in this matter." Instead of arguing that the Monisteres failed to meet the threshold requirements of submitting a proper estimate, State Farm argues that the Monisteres never, not even at trial, provided the evidence that would allow more to be paid. In State Farm's view, whether the estimate was sufficiently detailed is irrelevant.

In reviewing the issue, we note again that the Monisteres could receive compensation for the lowest of the coverage limit, the replacement cost of that part of the dwelling damaged, or the amount actually spent to repair. As plaintiffs who sought additional benefits at trial, the Monisteres shouldered the burden of proving that the $132,712 received from State Farm did not sufficiently cover their provable damage. State Farm submits that the November 2005 and January 2007 estimates "are the *only* evidence of record available to support an award of federal funds," and that the these documents are insufficient to establish that more is owed under the policy.

10

We examine some of the evidence. Two representatives of the parish government testified for the Monisteres. They spoke to the fact that the house could not be rebuilt as it was and had to be elevated. Brandon Monistere testified about the conditions inside the house, including the muck and destroyed possessions and the dreadful general conditions. Photographs of the damage that he had taken were introduced into evidence and discussed. Describing the mold above the level that the flood waters reached was part of his testimony. He also testified about some of the adjusting procedures and visits. Tara Monistere testified about the damage, the claims process involving State Farm, and her contacts with the parish government. Both homeowners testified as to the waterline in the house, which usually was described as being at three and a half to four feet above the floor. On cross-examination, State Farm's attorney made the point in the form of questions that, though the water only reached that level, the estimate included repairs above that level.

Also called as a witness was State Farm adjuster Michael Boudreaux. He testified that the amount paid to the Monisteres was based on the entire bottom floor being in need of repair up to the flood water level. The adjuster further explained that the policy would pay for gutting the entire house to that level, but not above. There was some ambiguity in the adjuster's records about just what the flood level was, which he explained.

David Andras, a second State Farm adjuster, was another witness. When questioned by State Farm's attorney, Andras testified as to the defects from the company's perspective in the repair estimate on which the Monisteres relied at trial. That estimate remains the primary evidence on appeal. Andras discussed the impossibility of determining from the estimate what amounts were for repairs below the floodwater level and which for damage above. Removing all drywall from the first floor, all molding, and all wiring would go above the flood policy's limits. Other claims also were not well developed. The first item was an

estimate of $9,000 for gutting the first floor and the second floor "as required." No evidence was introduced at trial as to the second-floor requirements. Item three provides another example. It was $4,000 for "mold remediation." No effort was made to demonstrate the type of remediation that was to occur or the specific areas that needed to be addressed. Item seven lists rewiring the entire home at a cost of $19,500. The Monisteres offered no evidence to elaborate on why the policy would cover rewiring the entire home when the flood waters did not reach the second floor. Another questioned entry on the estimate because it was higher than the water level was this: "Repair sag in 1st floor entry overhang and replace corroded ironwork – $6,000."

To award additional benefits based on such claims requires that we find that there is enough in the evidence to support them. State Farm's witnesses indicated that the physical limit of the flood coverage was at the level of the flood waters. Various policy provisions are relevant here. In an earlier section of the opinion, we noted that only "direct physical loss" was covered. That was defined in the policy as "[l]oss or damage to insured property, directly caused by a flood." Not included in that term were damages, including mold damage, resulting from water remaining in the home after flood waters receded. All witnesses questioned on the matter agreed that no mitigation of damages had occurred, such as removing drywall, carpet, or other saturated material. The effect on such policy exclusions of the fact that repairs or other mitigation in the turmoil after Katrina would likely have been impractical is not discussed by either party. It is important, though, that this is a congressionally created program, with rather severe limits in some respects.

The problem with the argument on appeal that more should be paid is that the Monisteres presented only their own testimony and submitted the estimates provided by Whites & Whites. Among the factual issues unaddressed by that evidence are how this damage avoided the policy requirement of direct physical

loss, and of not paying for damage such as from mold that occurs after the flood waters recede. No evidence was offered to justify paying for damage on the second floor resulting from the flood waters on the first floor. We do not know if the Monisteres could have factually supported the type of causation that was consistent with the policy terms. We are finding only that they never did.

We close with one piece of obviously self-serving but instructive testimony by State Farm. One of the adjusters testified that if the repairs for which no coverage or at least some question existed were removed, State Farm had already paid more than the Monisteres' estimate would justify. Whether that is true or not, it identifies why we cannot go through the estimate in a search for some clearly appropriate claims. No one questions that the Monisteres were entitled to substantial coverage under the flood policy. This whole suit has been about whether they were entitled to more than they had already received. We find no basis in this record on which the district court could have awarded a specific additional sum or even have determined that more was owed.

*C. Legal interest*

Because we are reversing the district court's decision and rendering judgment in favor of State Farm, the issue of whether it was appropriate for the district court to award legal interest on the Monisteres' judgment is now moot. We note that both parties agreed that the National Flood Insurance Program does not authorize interest, before or after judgment. *See Newton v. Capitol Assurance Co.*, 245 F.3d 1306 (11th Cir. 2001)*; Sandia Oil Co. v. Beckton*, 889 F.2d 258 (10th Cir. 1989); *In re Estate of Lee*, 812 F.2d at 256.

## III. CONCLUSION

The judgment of the district court is REVERSED, and judgment is RENDERED in favor of State Farm.